## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

ROY H. JOHNSON, DDS, and WINDY HILL
DENTISTRY, LLC, and D. CASEY HART DDS
P.C., individually and on behalf of all others
similarly situated,

     Plaintiffs,

           v.

THE HARTFORD FINANCIAL SERVICES
GROUP, INC., *et al.*,

     Defendants.

Civil Action No.
1:20-cv-02000-SDG

## <u>OPINION AND ORDER</u>

This matter is before the Court on a motion to dismiss filed by Defendants

Twin City Fire Insurance Company (Twin City) and Hartford Casualty Insurance

Company (HCIC) (collectively, the Writing Defendants) [ECF 44]; a motion to

dismiss filed by Defendants The Hartford Financial Services Group, Inc.; Hartford

Fire Insurance Company; Hartford Accident and Indemnity Company; Hartford

Insurance Company of the Southeast; Hartford Underwriters Insurance Company;

Hartford Insurance Company of the Midwest; Hartford Insurance Company of

Illinois; Sentinel Insurance Company, Ltd.; and Property and Casualty Insurance

Company of Hartford (collectively, the Non-Writing Defendants) [ECF 45]; and a

motion to dismiss the nationwide and non-Georgia state subclass claims by the

Writing Defendants [ECF 46]. For the following reasons, and with the aid of oral argument, the Writing Defendants' initial motion is **GRANTED** and all other motions are **DENIED AS MOOT**.

## I.   BACKGROUND[1]

Plaintiff Roy H. Johnson, DDS is a dentist in Cobb County, Georgia who owns and practices at Plaintiff Windy Hill Dentistry, LLC (Windy Hill).[2] Plaintiff D. Casey Hart DDS, P.C. (Casey Hart), is also a dental office in Cobb County.[3] Defendants are issuers of business insurance policies.[4] Johnson and Windy Hill purchased a business insurance policy, No. 20 SBW AM7715 DV, from Twin City with a policy period running from June 27, 2019 through June 27, 2020 (the Windy Hill Policy).[5] Casey Hart purchased a substantially similar business insurance policy, No. 20 SBW EZ4000 DV, from HCIC with a policy period running from September 1, 2019 through September 1, 2020 (the Casey Hart

---

[1]   The Court treats the following allegations as true for the purpose of this Order. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1274 (11th Cir. 1999) ("At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff.").

[2]   ECF 34, ¶ 30.

[3]   *Id*. ¶ 32.

[4]   *Id*. ¶¶ 19–25.

[5]   *Id*. ¶ 31. *See also* ECF 34-1 (Windy Hill Policy).

Policy).[6] Although issued by two different entities, the pertinent language of the two policies is identical.[7]

Relevant here, the Policies contain two provisions in which the Writing Defendants agreed to provide coverage. First, the Writing Defendants agreed to a "Business Income Loss" provision to pay "for direct physical loss of or physical damage to Covered Property at the premises described in the Declaration . . . caused by or resulting from a Covered Cause of Loss."[8] Second, the Policies contain a "Civil Authority" provision in which the Writing Defendants agreed to pay "the actual loss of Business Income you sustain when access to your 'scheduled premises' is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of your 'scheduled premises.'"[9]

---

[6]   ECF 34, ¶ 33. *See also* ECF 34-3 (Casey Hart Policy). The Court refers to the Windy Hill Policy and Casey Hart Policy collectively as the "Policies."

[7]   ECF 34, ¶ 34.

[8]   ECF 34-1, at 26. For ease of reference, although referring to the Policies cumulatively, the Court cites to the specific provisions contained in the Windy Hill Policy.

[9]   *Id*. at 36. The terms "you" and "your" as used in the Policies refer to Johnson/Windy Hill and Casey Hart, respectively.

In late-2019, a severe respiratory disease caused by the novel coronavirus SARS-CoV-2—colloquially known as COVID-19—emerged and was thrust to the forefront of global consciousness. It is an impossible task to cogently articulate the scope of COVID-19; it is not an exaggeration that the grave risks posed by COVID-19 have radically altered many aspects of daily life across the globe. As a general timeline, on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.[10] On March 13, 2020, President Donald Trump declared the outbreak of COVID-19 to be a national emergency.[11] In an attempt to slow the uncontrolled spread of this novel virus, many federal, state, and local governments took drastic action by implementing or recommending certain restrictions for individuals and businesses.[12] Most states issued some form of a shelter-in-place order.[13] For example, on March 14, 2020, Georgia Governor Brian Kemp declared a Public Health State of Emergency.[14] On April 2, 2020, Governor Kemp issued an Executive Order providing that "all residents and visitors of the State of Georgia are required to shelter in place within their homes or places of

---

[10]   ECF 34, ¶ 44.

[11]   *Id*. ¶ 48.

[12]   *Id*. ¶¶ 45, 49.

[13]   *Id*. ¶ 50.

[14]   *Id*. ¶ 55.

residence . . . taking every possible precaution to limit social interaction to prevent the spread or infection of COVID-19 to themselves or any other person."[15]

As a practical matter, the person-to-person transmission of COVID-19 poses special challenges to the dental industry. On March 18, 2020, the Centers for Medicare and Medicaid Services (CMS) recommended that all medical providers—including dentists—immediately delay all elective surgeries and all non-essential medical, surgical, and dental procedures.[16] Similar recommendations were subsequently issued by other entities specifically governing dental practices, such as the American Dental Association (ADA) and American Medical Association (AMA).[17] Additionally, the Centers for Disease Control (CDC) issued guidance recommending the postponement of all elective and routine medical procedures, including dental.[18]

As a result of the widespread proliferation of COVID-19, Governor Kemp's Executive Order, and recommendations from various governing entities, Plaintiffs decided to suspend or substantially reduce their dentistry practices.[19] As a result,

---

[15]   ECF 34, ¶ 55. *See also* ECF 44-2 (Executive Order).

[16]   ECF 34, ¶ 56.

[17]   *Id*. ¶¶ 57–59.

[18]   *Id*. ¶ 59.

[19]   *Id*. ¶ 64.

Plaintiffs have suffered monetary losses .[20] They made claims with the Writing Defendants under the Policies for those losses, but have been denied coverage.[21]

Johnson and Windy Hill initiated this putative class action on May 8, 2020.[22] On July 9, 2020, Plaintiffs filed their Amended Complaint, adding Casey Hart as a named Plaintiff.[23] Plaintiffs assert four claims against Defendants for breach of contract (Counts I–III) and declaratory judgment (Count IV).[24] In addition to their individual claims, Plaintiffs seek to represent a nationwide class—or in the alternative, state-based subclasses—of individuals who purchased business insurance policies from Defendants; were subject to federal, state, or other directives to limit, suspend, or temporarily close their practices; but not reimbursed for their covered losses.[25] Defendants have filed three separate motions to dismiss.[26] On December 21, 2020, the Court heard oral argument from the parties on all outstanding motions.

---

[20]   *Id.* ¶ 65.

[21]   *Id.*

[22]   ECF 1.

[23]   ECF 34.

[24]   *Id.* ¶¶ 109–42.

[25]   *Id.* ¶¶ 94–108.

[26]   ECF 44; ECF 45; ECF 46.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) provides for the dismissal of a complaint that fails to state a claim upon which relief can be granted. Fed. R. Civ. P 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556).

This pleading standard "does not require detailed factual allegations," but "requires more than unadorned, the-defendant-unlawfully-harmed-me accusations." *McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678) (brackets omitted). A complaint providing "mere 'labels and conclusions,' 'formulaic recitations of the elements of a cause of action,' or 'naked assertions devoid of further factual enhancement'" will not suffice. *Kinsey v. MLH Fin. Servs., Inc.*, 509 F. App'x 852, 853 (11th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). Although the "plausibility standard is not akin to a probability

requirement at the pleading stage," it demands "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of the claim." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (citing *Twombly*, 550 U.S. at 556).

## III.   DISCUSSION

### a.   The Writing Defendants' Motion to Dismiss

In the Amended Complaint, Plaintiffs allege the circumstances caused by COVID-19 triggered the Writing Defendants' obligation to provide coverage under the Business Income Loss and Civil Authority provisions of the Policies. The Writing Defendants, conversely, argue Plaintiffs have failed to state a facially plausible claim under either provision.

Under Georgia law, insurance contracts "are interpreted by ordinary rules of contract construction."[27] *Boardman Petrol., Inc. v. Federated Mut. Ins. Co.*, 269 Ga. 326, 327 (1998). The "[c]onstruction and interpretation of an insurance contract are matters of law for the court." *Landmark Am. Ins. Co. v. Khan*, 307 Ga. App. 609, 612 (2011). "The cardinal rule of contractual construction is to ascertain the intent of

---

[27] The parties agree that Georgia substantive law governs the dispute at this stage [ECF 44-1, at 9 n.3].

the parties." *Knott v. Knott*, 277 Ga. 380, 381 (2003) (citing O.C.G.A. § 13-2-3).

Contract interpretation requires three steps:

> First, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.

*City of Baldwin v. Woodard & Curran, Inc.*, 293 Ga. 19, 30 (2013).

An insurance contract is considered ambiguous "only if its terms are subject to more than one reasonable interpretation." *State Farm Mut. Auto. Ins. Co. v. Staton*, 286 Ga. 23, 25 (2009) ("The policy should be read as a layman would read it and not as it might be analyzed by an insurance expert or an attorney."). Put another way, "[w]here the terms are clear and unambiguous, and capable of only one reasonable interpretation, the court is to look to the contract alone to ascertain the parties' intent." *Boardman*, 269 Ga. at 328. Although the insurance contract should "be read in accordance with the reasonable expectations of the insured where possible"—*id.*—the Court has no more right to afford the contract a "strained construction to make the policy more beneficial by extending the coverage contracted for than [it] would have had to increase the amount of the insurance."

*Ga. Farm Bureau Mut. Ins. Co. v. Smith*, 298 Ga. 716, 721 (2016) (internal quotation marks omitted) (citation omitted). *See also Henry's La. Grill, Inc. v. Allied Ins. Co. of Am.*, No. 1:20-cv-2939-TWT, 2020 WL 5938755, at *3 (N.D. Ga. Oct. 6, 2020) ("Georgia courts will not strain to extend coverage where none was contracted or intended."); *Staton*, 286 Ga. at 25 ("[T]his court may not strain the construction of the policy so as to discover an ambiguity. . . . [T]he rule of liberal construction of an insurance policy cannot be used to create an ambiguity where none, in fact, exists.").

### i.   Business Income Loss Coverage

Plaintiffs first allege that the Writing Defendants owed them a duty to provide coverage under the Business Income Loss provision in the Policies. In that provision, the Writing Defendants agreed to "pay for **direct physical loss** of or **physical damage** to Covered Property at the premises described in the Declarations . . . caused by or resulting from a Covered Cause of Loss."[28] They also agreed to "pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration.'"[29]

---

[28]   ECF 34-1, at 26 (emphasis added).

[29]   *Id*. at 35.

The Writing Defendants argue that the claim must be dismissed because Plaintiffs cannot allege a "direct physical loss of or physical damage to" their dental offices.

The term "direct physical loss of or physical damage to" is not defined in the Policies. But that does not necessarily create an ambiguity; an undefined contract term "must be afforded its literal meaning," as "plain[,] ordinary words [are] given their usual significance." *Unified Gov't of Athens-Clarke Cnty. v. McCrary*, 280 Ga. 901, 903 (2006). According to the Georgia Court of Appeals, the term "direct physical loss or damage to" in an insurance policy "contemplates an ***actual change*** in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it so." *AFLAC Inc. v. Chubb & Sons, Inc.*, 260 Ga. App. 306, 308 (2003) (collecting cases) (emphasis added). When these terms are employed, "coverage is predicated upon a change in the insured property resulting from an external event rendering the insured property, initially in a satisfactory condition, unsatisfactory." *Id.* Relying on *AFLAC*, courts in this district have refused to "expand 'direct physical loss' to include loss-of-use damages when the property has not been physically impacted in some way." *Ne. Ga. Heart Ctr., P.C. v. Phoenix Ins. Co.*, No. 2:12-cv-00245-WCO, 2014 WL 12480022, at *6 (N.D. Ga. May 23, 2014) ("To do so would

be equivalent to erasing the words 'direct' and 'physical' from the policy."). *See Henry's La. Grill*, 2020 WL 5938755, at *4 (relying on *AFLAC* and holding insurer not required to provide coverage under similar facts). *See also Mama Jo's Inc. v. Sparta Ins. Co.*, 823 F. App'x 868, 879 (11th Cir. 2020) (citing *AFLAC* and holding that, "under Florida law, an item or structure that merely needs to be cleaned has not suffered a 'loss' which is both 'direct' and 'physical'").

More specifically, a litany of federal and state courts across the country interpreting similar policy language have roundly dismissed COVID-19-related insurance cases for failure to allege that the covered properties sustained any physical damage. *E.g., El Novillo Rest. v. Certain Underwriters at Lloyd's, London*, No. 1:20-cv-21525-UU, 2020 WL 7251362, at *6 (S.D. Fla. Dec. 7, 2020) (collecting cases); *Hillcrest Optical, Inc. v. Cont'l Cas. Co.*, No. 1:20-cv-275-JB-B, 2020 WL 6163142, at *7 (S.D. Ala. Oct. 21, 2020) ("[S]everal courts have recently decided that absent allegations of some tangible alteration to property, litigants have suffered no direct physical loss of property in other business interruption disputes arising consequent to COVID-19 closure orders.") (collecting cases); *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, No. 4-20-cv-222-CRW-SBJ, 2020 WL 5820552, at *1 (S.D. Iowa Sept. 29, 2020) (dismissing claim because plaintiff "does not allege any such 'physical' or 'accidental' loss, but instead contends its loss was caused by the

COVID-19 coronavirus and the government actions to suspend temporarily non-emergency dental procedures"); *Sandy Point Dental, PC v. Cincinnati Ins. Co.*, No. 20 CV 2160, 2020 WL 5630465, at *2 (N.D. Ill. Sept. 21, 2020) ("The critical policy language here—'direct physical loss'—unambiguously requires some form of actual, physical damage to the insured premises to trigger coverage.").[30]

Plaintiffs here posit that the "uncontained proliferation of a deadly virus"—COVID-19—which is "highly communicable and resilient [in] nature" *must* be present in their dental offices, thus demonstrating an external force exacting a direct change on the properties that renders them unsatisfactory.[31] Put another way, "[i]t is the infiltration and proliferation of the virus which caused a 'physical loss of or damage to' the premises."[32] Plaintiffs pose the following sequence:

> [P]rior to the COVID-19 pandemic, the walls, doors, windows, and other external and internal physical barriers were an effective means of curbing the spread of infectious diseases. COVID-19 spreads rapidly regardless of physical barriers, and once inside a building, it can remain viable for hours. The highly communicable and resilient nature of COVID-19 renders the very walls, doors, windows, and other external and internal physical barriers unsatisfactory for one of their

---

[30] *See also* ECF 67, at 6 (listing 22 cases dismissing COVID-related insurance disputes); ECF 77 (listing 27 more recently decided cases).

[31] *See* ECF 63, at 14.

[32] *Id.* at 15.

most elementary purposes—preventing the spread of disease.[33]

Plaintiffs' argument is flawed for two reasons.

First, Plaintiffs have not alleged that the COVID-19 virus caused any *physical* damage to the properties. Plaintiffs do not allege any tangible alteration to a single physical edifice or piece of equipment located in or around their dental offices. Plaintiffs have likewise not alleged that COVID-19 induced a detrimental change to the property's operational capabilities. By all accounts, the structural integrity of the dental offices' "walls, doors, windows, and other external and internal physical barriers" remain entirely unscathed despite the proliferation and persistence of COVID-19. Any "actual change" is instead premised on the omnipresent specter of COVID-19, a generalized "alteration" experienced by every home, office, or business that welcomes individuals into an indoor setting across the globe. But absent from the Amended Complaint are any allegations that Plaintiffs' offices have sustained any modicum of physical damage that renders them unsatisfactory in any way. To accept Plaintiffs' broad interpretation of the Policies' language at face value would be to render the term "physical" a nullity, a result directly counter to Georgia law. *Ace Am. Ins. Co. v. Wattles Co.*, 930 F.3d

---

[33]   *Id.* at 14 (citations omitted).

1240, 1261 (11th Cir. 2019) ("Georgia law prefers a construction that will not render any of the policy provisions meaningless or mere surplusage.") (quoting *Nat'l Cas. Co. v. Ga. Sch. Boards Ass'n-Risk Mgmt. Fund*, 304 Ga. 224, 227 (2018)). As Chief Judge Thomas W. Thrash of this Court aptly noted in dismissing a substantially similar argument, "[t]his interpretation of the contractual language exceeds any reasonable bounds of possible construction, pushing the words individually and collectively beyond what any plain meaning can support." *Henry's La. Grill*, 2020 WL 5938755, at *4.

Second, even if the Court eschewed the physical damage requirement and considered the mere presence of COVID-19 enough to cause "direct physical loss of or physical damage to" the offices, Plaintiffs still have not stated a facially plausible claim. In the Amended Complaint, Plaintiffs aver that "[t]he presence of COVID-19 is the cause of 'direct physical loss' and 'physical damage' to [their] premises."[34] But critically, beyond this conclusory statement the Amended Complaint does not allege that COVID-19 ever actually entered into the dental offices. The Amended Complaint likewise does not point to any instance of an employee or patient contracting the virus where it was traced to the properties.

---

[34]   ECF 34, ¶ 82.

Nor do Plaintiffs present the Court with a reliable method for determining if the virus could be detected in the offices. They instead rely solely on speculation: *i.e.*, due to the exceedingly high number of COVID-19 cases in Georgia and ease of person-to-person transmission during the relevant time period, COVID-19 ***must*** have somehow found its way into the offices.[35] The Court does not discount that this could, theoretically, be true. Neither does the Court take lightly the dangers presented by COVID-19, as well as the exponential growth of cases present in Georgia and this district. But the law is clear: Plaintiffs cannot rely on conjecture and speculation to survive a motion to dismiss. *Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true."). *See also Uncork & Create LLC v. Cincinnati Ins. Co.*, No. 2:20-cv-00401, 2020 WL 6436948, at *5 (S.D. W. Va. Nov. 2, 2020) (dismissing COVID-19-related insurance case and stating, "nor [does] the instant case[ ] involve actual allegations of employees or patrons with infections traced to the business."); *Henry's La. Grill*, 2020 WL

---

[35]  *See, e.g.*, ECF 63, at 15 ("As the pandemic roared through the United States and Georgia, it was not a question of whether COVID-19 might be present at the premises. . . . Because of the inherent nature and risks of COVID-19, the virus ***could certainly be*** physically present at the premises, infiltrating the interior offices and equipment used by Plaintiffs to practice dentistry.") (emphasis added).

5938755, at *4 (dismissing COVID-19-related insurance case and stating, "Plaintiffs repeatedly note that COVID-19 has never been identified on the premises. Therefore, no physical change as a result of the virus' presence can be argued here.") (citation omitted); *Malaube, LLC v. Greenwich Ins. Co.*, No. 20-22615-CIV, 2020 WL 5051581, at *7 (S.D. Fla. Aug. 26, 2020) (dismissing COVID-19-related insurance case and stating, "[p]laintiff has not alleged any physical harm. There is no allegation, for example, that COVID-19 was physically present on the premises.").

In sum, the Court finds that the Writing Defendants did not owe Plaintiffs an obligation to provide coverage under the Business Income Loss provision.

### ii. Civil Authority Coverage

Plaintiffs also allege the Writing Defendants owed them a duty to provide coverage under the Civil Authority provisions in the Policies. In those provisions, the Writing Defendants agreed to pay "the actual loss of Business Income you sustain when access to your 'scheduled premises' is ***specifically prohibited by order of a civil authority*** as the direct result of a Covered Cause of Loss to property in the immediate area of your 'scheduled premise.'"[36] Plaintiffs allege the

---

[36]   ECF 34-1, at 36 (emphasis added).

circumstances necessitating a suspension or reduction of their businesses triggered coverage under this provision. The Writing Defendants disagree and argue that (1) Plaintiffs have not alleged any direct physical loss to their property, and (2) even if they had, Plaintiffs have not alleged they were "specifically prohibited" from accessing their properties.

At the starting gate, the Court has already found that Plaintiffs have not plausibly alleged any "direct physical loss of or physical damage to" their dental offices. This alone is fatal to their claim under the Civil Authority provision. Even assuming Plaintiffs' had plausibly alleged a physical loss, the claim would still have to be dismissed. Again, Chief Judge Thrash's analysis in *Henry's Louisiana Grill* is instructive on this point:

> Plaintiffs have not pleaded sufficient facts to demonstrate coverage under the Civil Authority provision. The provision contains several clear conditions precedent for coverage. First, the Plaintiffs have pleaded no facts regarding a civil authority's action that prohibited access to the premises. The Governor's Executive Order had no substantive provisions limiting access to private businesses or their operations. While the Order could be read as "advising" residents to stay home, the Order itself does not represent an action to prohibit access to the described premises. And the Plaintiffs point to no other action by a civil authority that could have prohibited access to their [premises] at the time of the closure. Second, the Plaintiffs pleaded no facts that the areas "immediately surrounding" the damaged

> properties were blocked by the civil authority. In fact, the Plaintiffs do not identify any particular property around their premises which was damaged by COVID-19 or had its access restricted by a civil authority.

2020 WL 5938755, at *6 (citation omitted).

This rationale likewise applies to this case. It is clear from Plaintiffs' Amended Complaint and cited civil authorities that they have never been specifically prohibited from accessing their dental offices or from offering limited procedures during the COVID-19 pandemic. For example, the allegations in the Amended Complaint demonstrate that the guidance issued by the ADA, AMA, CDC, and CMA did not constitute *orders*; they were *recommendations* that health care providers—including dentists—cancel or postpone elective and non-emergency services in an effort to mitigate the spread of COVID-19.[37] But Plaintiffs do not allege these recommendations prevented them from performing essential dental services. Likewise, there is no allegation that these recommendations barred them from physically accessing their properties.

Plaintiffs' reliance on Governor Kemp's Executive Order fares no better. In relevant part, it ordered:

> That all residents and visitors of the State of Georgia are required to shelter in place within their homes or places

---

[37]   ECF 34, ¶¶ 55–60.

> of residence, meaning remaining in their place of
> residence and taking every possible precaution to limit
> social interaction to prevent the spread or infection of
> COVID-19 to themselves or any other person.[38]

The Executive Order, however, contained specific exceptions critical to this case.

First, it exempted residents that are "part of the workforce for Critical

Infrastructure and are actively engaged in the performance of, or travel to and

from, their respective employment."[39] The Executive Order defined "Critical

Infrastructure" as the entities identified by the U.S. Department of Homeland

Security (DHS) as "essential critical infrastructure."[40] The DHS guidance, in turn,

specifically identified "dentists" as "essential critical infrastructure workers."[41]

Thus, according to the terms of the Executive Order, Plaintiffs were not only able

to physically access their property, but were permitted to remain open and serve

their patients, subject to certain limitations and restrictions.

Even if the Court did not consider Plaintiffs part of the "Critical

Infrastructure," the Executive Order also made an allowance for individuals to

"engage[ ] in the performance of, or travel to and from, the performance of

---

[38]   ECF 44-2, at 3.

[39]   *Id*. at 4.

[40]   *Id*. at 6.

[41]   ECF 44-3, at 6 (DHS Guidance dated Mar. 9, 2020).

Minimum Basic Operations for a business . . . not classified as Critical Infrastructure."[42] The Executive Order provided a list of activities that constituted "Minimum Basic Operations," which included the "minimum necessary activities to maintain the value of a business" and "remaining open to the public subject to the restrictions of this Order."[43] This too demonstrates that Plaintiffs were not entirely precluded from treating patients or specifically prohibited from accessing their properties.

At bottom, the Court is sympathetic to Plaintiffs' hardships and losses caused by COVID-19. As a matter of public health and community well-being, the Court commends Plaintiffs' decision to suspend or reduce their practices in an effort to decrease the virus's spread. However, the Court is prohibited by Georgia law from so liberally construing an insurance policy to provide coverage in instances where none was intended. Plaintiffs' factual allegations simply do not fit within the plain, unambiguous language employed in the Policies as to trigger coverage. As Defendants' counsel aptly noted during oral argument, COVID-19 hurts people, not property. Therefore, the Amended Complaint cannot survive the motion to dismiss.

---

[42]   ECF 44-2, at 4.

[43]   *Id*. at 4–5.

### iii.    The Remaining Motions

Both the Writing and Non-Writing Defendants have filed other currently pending dispositive motions. In their motion to dismiss the Amended Complaint, the Writing Defendants aver that a grant of that motion would obviate the need for the Court to reach the remaining motions.[44] During oral argument Plaintiffs' counsel conceded this point, and the Court agrees. Since Plaintiffs have failed to plausibly allege that the Writing Defendants owed an obligation to provide coverage under the Policies, the Amended Complaint must be dismissed in its entirety. The Court need not reach the arguments asserted in the separate motions, which are denied as moot.

---

[44]   ECF 44-1, at 11 n.5.

IV.     CONCLUSION

The Writing Defendants' motion to dismiss [ECF 44] is **GRANTED**. The Non-Writing Defendants' motion to dismiss [ECF 45] and the Writing Defendants' motion to dismiss certain class claims [ECF 46] are **DENIED AS MOOT**. Plaintiffs' claims are **DISMISSED WITH PREJUDICE**. The Clerk of Court is **DIRECTED** to close this case.

**SO ORDERED** this the 4th day of January 2021.

Steven D. Grimberg
United States District Court Judge